IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| ALAN BAER REVOCABLE TRUST DATED FEBRUARY 9, 1996, as Amended (Successor-in-Interest to the Estate of Alan A. Baer, Deceased),<br><br>        Plaintiff,<br><br>        v.<br><br>UNITED STATES OF AMERICA,<br><br>        Defendant. | 8:06CV774<br><br>MEMORANDUM AND ORDER |

This matter is before the court for resolution after a trial to the court on January 19, 2010.

I.  FINDINGS OF FACT

The parties agree that Alan Baer (hereinafter, "the decedent") died testate on November 5, 2002.  The post-death distribution of his estate was directed in the provisions of his Last Will and Testament and in testamentary provisions of the Alan Baer Revocable Trust dated February 9, 1996, as Amended (hereinafter, "the Trust").  The Trust provides as follows:

> In the event that Settlor's interest in ComoreTel (a private equity interest) is sold and a profit realized, as determined in the sole and absolute discretion of Trustee, Trustee shall distribute outright in amounts and to those individuals set out below in the order set forth herein and with each specific bequest having to be fully funded before the next listed bequest is funded. In the event any of these bequests are not funded prior to the death of Marcia, they shall automatically lapse.
>
> > (a) One Hundred Thousand Dollars ($100,000.00) outright to Settlor's brother, John David Baer, if he shall survive Settlor.

>    (b) One Hundred Thousand Dollars ($100,000.00) outright to Settlor's brother, Robert Baer, M.D., if he shall survive Settlor.
>
>    (c) Fifty Thousand Dollars ($50,000.00) outright to each of the following named grandchildren of Settlor: Zachary Baer, John A. Baer, and Stephanie Baer, who shall survive Settlor.
>
>    (d) One Hundred Thousand Dollars ($100,000.00) outright to each of Settlor's nieces and nephews, Nancy L. Baer, John D. Baer, Jr., Margaret J. Baer, Debra Baer, Christine Baer, Michael Baer, and Patricia Baer, who shall survive Settlor.
>
>    (f) The following sums to the following individuals, who shall survive Settlor:
>
>    >    Marty Florschlinger $250,000.00
>    >    Helmuth Dahlke $5,000.00
>    >    Terry Tegeder $5,000.00
>    >    Steve Hinners $2,000.00
>    >    Susie Buffet $1,000.00
>    >    Terry Tippit $1,000.00
>    >    Joshua Diaz $25,000.00
>    >    Amber Kalina $2,000.00
>    >    Geneva Gray $2,000.00
>    >    Linda Davis $2,000.00
>    >    Susie Peebler $1,000.00

The Trust, Article 6, Item 2, ¶ 1. The total amount of the contingent bequests is $1,346,000.00.

The plaintiff (hereinafter, "the Estate") filed an estate tax return, Form 706. Alan Baer owned an interest in 1,462,680 shares of ComoreTel stock which the Estate originally valued at $10,955,984.00 as of Alan Baer's date of death. The value of the ComoreTel stock was based on a date-of-death appraisal of ComoreTel obtained by the estate and attached to the estate tax return. *See* Exhibit ("Ex.") 3. The appraisal was performed by George Rebensdorf and was dated May 2003. *See* Ex. 18. The plaintiff reported estate tax due of $10,634.23 on the Form 706 and that amount was paid when the estate tax return was filed.

The IRS examined the decedent's estate tax return. *See* Ex. 4. Based on the examination, the IRS determined the decedent's additional estate tax liability was $813,504.00 and that amount was assessed on January 31, 2005, plus statutory interest totaling $50,083.00. On December 9, 2004, the estate made an advance payment totaling $863,587.00 of the estate tax deficiency. That payment satisfied the additional estate tax assessed, as well as the statutory interest.

In January 2006, George Rebensdorf reappraised the value of the ComoreTel stock. The reappraisal placed the value of Alan Baer's interest in ComoreTel at $851,114.00. On June 8, 2006, plaintiff filed its claim for refund, Form 843, requesting a refund of estate tax totaling $578,984.00. On the date of Mr. Baer's death his total dollar investment in the ComoreTel Stock totaled $4,814,798.00. Decedent's spouse, Marcia Baer, is still living.

Based on the evidence adduced at trial, the court additionally finds that at the time of Alan Baer's investment in ComoreTel, it was a start-up company in the telecommunications field. The President and CEO of ComoreTel, Charles "Chuck" Smith, testified at trial. He explained that the International Telecommunications Union, a United Nations regulatory body, assigns a numerical country code to each country. The Union of the Comoros ("Comoros") is a group of islands off the west coast of Africa near Madagascar and its country code is 269. The mathematical combination of phone numbers available to Comoros far exceeds its population, which allows Comoros to enter agreements with other entities for the use of its country code. ComoreTel was one of those entities.

Comoros, through its government owned monopoly telephone company, SMPT, had entered into a joint venture agreement with ComoreTel that would provide ComoreTel

exclusive rights to use the 269 code.  ComoreTel's business plan was to utilize the 269 code to furnish a single-number, global calling-access plan that would provide an international global toll-free network system (similar to the "800 number" toll-free service in the United States) to its customers.  The distinctive feature was that the caller would not have to dial a separate number or access code to use the service.  Smith testified that the value of the joint venture was that Comoros was one of only a handful of countries with a low population and excess numbers.  Also, Comoros had a single remote gateway through which all of its calls were routed—via satellite through Paris—under an agreement with France Telecom agreement.  Smith testified that once the joint venture was in place, calls could be routed through countries with a lower settlement rate for calls, immediately placing the company in the "international arbitrage game."  Smith testified that ComoreTel's business plan had the potential for huge profits.

As part of the joint venture agreement, the Comoran government had agreed to ensure that the 269 calls would be routed through ComoreTel's gateway, instead of France Telecom's gateway.  Smith's former company, Via Services/Oration, was first engaged by ComoreTel as a consultant to build and develop the gateway.  Eventually, Via Services/Oration and ComoreTel merged.  Shortly before the merger, the President of Comoros died and a new Minister of Communication was appointed.  Smith testified that the new government was less enthusiastic about the joint venture, but reaffirmed it nonetheless.

Smith testified that he had met with Comoran officials in the winter of 2000 to firm up details on the joint venture.  Under the agreement, ComoreTel was to build and develop its gateway, get customers, and negotiate agreements with other countries for settlement

4

rates on calls. The Comorans were to give ComoreTel the excess numbers, allow ComoreTel to negotiate settlements, and begin to route calls through ComoreTel's gateway instead of France Telecom's gateway. In mid-to-late 2002, the joint venture between ComoreTel and the Comorans began to unravel.

The Comoran telephone company refused to instruct France Telecom to reroute calls through ComoreTel's gateway. ComoreTel then developed an alternate plan involving a gateway in Norway. Smith testified that he continued to meet with the Comorans through the summer of 2002 and was assured the deal was moving forward. In July 2002, he met with SMPT officials in Comoros to finalize the contracts between ComoreTel, SMPT and the Norwegian Phone Company and was surprised by the Comorans' cool reception. The Comorans refused to sign the contract, which would have had the effect of ending the relationship between SMPT and France Telecom. Smith believed stopping ComoreTel's royalty payments could provoke the Comorans to change their minds. ComoreTel stopped paying royalties in October 2002. Smith also testified that, as of that date, ComoreTel had never made a profit.

The business venture between the Comorans and ComoreTel effectively ended after the final royalty payment for the month of September 2002 was paid. ComoreTel's business plan, using the 269 code for an international calling-card, was never implemented. Although negotiations to salvage the venture continued for several months, the parties were unable to reach an agreement. They ultimately settled their differences through litigation that ended in 2004. Alan Baer died in November 2002. Later, ComoreTel acquired its own "country code" number from the International Telecommunications Union, and developed a premium services product (akin to "900

number" services). ComoreTel's code, however, cannot be used to provide international calling, as the 269 code would have.

Brad Tribulato also testified at the trial. He is a self-employed investment manager and has managed a substantial portion of Alan Baer's wealth since the 1980s. He is the trustee of the Trust and a general partner in Underwood Limited Partnership, which is the entity through which the Trust owns ComoreTel stock. He also managed the funds of Norm Waitt, one of the founders of Gateway computers, who also invested in ComoreTel. He testified that as of the time of his death, Alan Baer had invested 4.8 million dollars in ComoreTel. He testified that the company would have had to have been sold for 30 million dollars in November 2002 in order to pay off all the investors and produce a profit on Alan Baer's 4.8 million dollar investment.

He testified that before Alan Baer died, Baer told Tribulato that Baer's primary goal was to protect his wife financially, but that he would like to remember several others in his estate plan. Baer, Tribulato, and Baer's attorney, Robert Murray, met to discuss amending the Trust to that effect. Tribulato suggested that Baer could leave a contingent bequest to the others, to be paid out of the profits, that would be generated by the ComoreTel investment. Tribulato testified that Baer's intention was that his wife would first recoup his roughly 4.8 million dollar investment in ComoreTel, and then the profits, up to the amount of $1,346,000.00, would be distributed to twenty-three named individuals in the order they were listed in the trust. The provision that was eventually added to the Trust clearly provides that the presiding individual bequest must be fully paid before the next listed bequest is distributed. Mr. Tribulato testified that he and the other Trustees interpret the

provision to mean that Alan Baer's 4.8 million dollar investment would be recovered by Marcia Baer before any funds would be distributed to the listed recipients.

George Rebensdorf also testified at the trial. He testified that at the time he first appraised ComoreTel in 2003, he was not aware that the joint venture agreement had essentially fallen apart. His projections and valuation were based on the assumption that ComoreTel's business plan was still viable. He did recognize at the time, however, that the biggest risk to ComoreTel was its relationship with a potentially politically unstable third-world country. He testified that the 2003 valuation reflected a reasonable value for ComoreTel based upon what he knew at the time. The valuation was based on the assumption that royalty payments were being made and the joint venture was still in force. He further stated that at the time of his first appraisal, ComoreTel had no revenues.

Mr. Rebensdorf also testified that a reasonable prospective purchaser of a business ordinarily conducts a due diligence examination of the financial condition of a company before a purchase. Such due diligence would include a review of a company's contracts and agreements. Any such examination would have revealed that ComoreTel's business plan was defunct and that it had no joint venture agreement with Comoros. He stated that Alan Baer's interest in ComoreTel stock would have been essentially worthless at the time of Alan Baer's death. ComoreTel's only asset was the business plan, with its potential for a big return, that was premised on the joint venture agreement. In spite of Smith's and Tribulato's hopes to the contrary, in actuality, the company had no joint venture and no viable business plan in November of 2002. No reasonable, informed buyer would have bought the company or Alan Baer's interest in it for any sum that would have approached

the amount Alan Baer had invested. Marcia Baer is presently 78 years old. To date, ComoreTel has earned a profit in only two months.

The government did not produce any witnesses, relying on the cross-examination of the plaintiff's witnesses.

II. CONCLUSIONS OF LAW

    A. Law

The legal principles underlying the court's determination analysis are set out in the court's Memorandum and Order on the defendant's motion for summary judgment and need not be fully repeated here. *See* Filing No. 52. The government argues that the IRS correctly collected estate tax on $1,346,000.00 in contingent bequests because that amount did not qualify for the marital deduction due to the possibility that the bequests could be paid to the twenty-three individuals during Marcia Baer's lifetime. The Estate agrees that the contingent bequests should not be part of the marital deduction, but argues that the issue is whether the contingent bequests had any value at the time of Alan Baer's death.

In a taxpayer refund suit, the taxpayer bears the ultimate burden of proving that the taxpayer overpaid his tax. *Armstrong v. United States*, 366 F.3d 622, 625-26 (8th Cir. 2004). To sustain the burden, the taxpayer must prove that the determination of the IRS was wrong. *IA 80 Group, Inc. and Subsidiaries v. United States*, 347 F.3d 1067, 1071 (8th Cir. 2003). The plaintiff "carries the burden of proving 'that the United States has money which belongs to him.'" *Id.* (quoting *Lewis v. Reynolds*, 284 U.S. 281, 284 (1932).

An estate tax is imposed "on the transfer of the taxable estate" of every deceased United States citizen or resident and the gross estate includes "the value at the time of his

death of all property, real or personal, tangible or intangible, wherever situated." 26 U.S.C. §§ 2001, 2031. The value of the gross estate is the decedent's property interest at the time of his death, generally measured in terms of its fair market value. 26 U.S.C. § 2033. Fair market value is "'the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy nor to sell and both being informed.'" *Hamm v. Commissioner*, 325 F.2d 934, 937 (8th Cir. 1963) (quoting *O'Malley v. Ames*, 197 F.2d 256, 257 (8th Cir. 1952).

The fair market value of an unlisted security held as stock is determined by considering the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors, including "the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange." Treas. Reg. 20.2031-2(f)(2). The fair market value of nonpublicly traded stock is best ascertained through arm's-length sales near the valuation date and when nonpublicly traded stock cannot be valued from such arm's-length sales. Its value is then best determined by analyzing the value of publicly traded stock in comparable corporations engaged in the same or a similar line of business, as well as by taking into account all other relevant factors bearing on value that would be considered by an informed buyer and an informed seller. *Polack v. Commissioner*, 366 F.3d 608, 611 (8th Cir. 2004). "Because property is valued as of the date of death, the only relevant facts are those that this hypothetical buyer and seller could reasonably have

9

been expected to know at that time." *First Nat'l Bank of Kenosha v. United States*, 763 F.2d 891, 893-94 (7th Cir. 1985).

The assets left outright to a spouse are not subject to estate tax because of the marital deduction, which generally exempts from tax assets left to a spouse or to a trust for a spouse's benefit. 26 U.S.C. § 2056(a) (a taxpayer is entitled to a deduction reducing the taxable value of his gross estate by "an amount equal to the value of any interest in property which passes or has passed from the decedent to his surviving spouse, but only to the extent that such interest is included in determining the value of the gross estate"). The Internal Revenue Code exempts, however, any interest passing to the surviving spouse that may terminate or fail on the occurrence or nonoccurence of an event or contingency, such as a life estate, unless the interest qualifies for treatment as a "qualified terminable interest in property" ("QTIP"). 26 U.S.C. § 2056(b)(7). The purpose of the marital deduction provision and QTIP limitation was to extend to spouses in common-law states the advantages of married taxpayers in community property states, to bring about a two-stage payment of estate taxes, and to prevent an escape from tax liability at the second step, i.e., the passing of the surviving spouse's interest to "any other person" on termination of her life estate or other terminable interest without estate or gift tax. See 26 U.S.C. § 1014(a)(1); *Citizens Nat'l Bank of Evansville v. United States*, 359 F.2d 817, 819-20 (7th Cir. 1966).

### B. Analysis

The court finds that under the express terms of the Trust, the contingent bequests come into play only if a profit is realized on the Alan Baer's investment in ComoreTel. The evidence shows that at the time of Alan Baer's death, the prospect that the Estate's

interest in ComoreTel could have recouped an amount greater than his investment of 4.8 million was virtually nonexistent.  The court finds that the joint venture with Comoros was doomed before Alan Baer's death.  The evidence adduced at trial shows that the date-of-death value of Alan Baer's interest in ComoreTel stock was essentially zero.  The Estate has presented credible evidence showing that a willing buyer in a hypothetical situation would have performed due diligence and would have ascertained that the joint venture agreement between Comoros and ComoreTel had fallen apart and that ComoreTel essentially had no business plan.  The fact was that in the fall of 2002, there would have been nothing for a willing buyer with knowledge of relevant facts to buy.

The Estate has shown that the valuation on which the IRS relied in making its estate tax assessment was based on the faulty assumption that ComoreTel had a potentially hugely profitable business model and a joint venture agreement in place to effectuate it.  The Estate has shown that the 2003 valuation report is incorrect.  The government has not presented evidence to the contrary.  Rebensdorf's 2006 valuation reflects the company's later response to the change in business conditions occasioned by the failure of the joint venture and the company's subsequent reliance on a new, less-profitable, business model.  The values reflected in the 2006 report are not probative of the date-of-death value.  It is relevant only insofar as it lends credence to the conclusion that the 2003 valuation was not correct.  The 2003 valuation report has been discredited by Rebensdorf's testimony that it was based on faulty information.  That being the case, there is no record evidence to support the Commissioner's deficiency assessment.

The evidence shows that ComoreTel's first business model had the potential to create great returns to an investor, while the new business model has the potential for

more modest returns. Although the company may have had some inchoate value (for example, the value of its human capital and goodwill as assets) at the date of Alan Baer's death, the government has presented no evidence that the value would have approached the point at which it would exceed Alan Baer's original investment, so as to be characterized as "profit." All of the evidence is to the contrary. The Estate has shown, both under the express terms of the Trust and under the trustees' understanding of those terms, that the Baer Estate was to have been compensated for Alan Baer's initial investment before any transfers would have been made to the contingent beneficiaries. Accordingly, the court finds the Estate has established that the contingent bequests had no value, since Marcia Baer's 4.8 million interest would have had to be satisfied before the contingent beneficiary's interests would vest. The contingent bequests were effectively extinguished since the Estate has shown that there is virtually no chance that the bequests could be paid during Marcia Baer's lifetime.

  The evidence shows that in November of 2002, no willing, informed buyer would have purchased the ComoreTel stock for an amount even approaching its cost basis. Though it may have taken months or years for this reality to dawn on ComoreTel's principals and investors, the reality is that once ComoreTel ceased making royalty payments to Comoros, their joint venture, and, hence, ComoreTel's business plan, was dead. Although there may have been some value to certain assets of the company and some degree of prospective earning power, the probability of the decedent's share that value exceeding 4.5 million dollars during Marcia Baer's lifetime is slim to none. Accordingly, the court finds that the possibility that the transfer to the contingent beneficiaries would ever come to fruition is so remote that it is negligible. Also, there is no

evidence to suggest that the eventual transfer of ComoreTel stock will escape taxation. The assets will be taxed in Marcia Baer's estate at their fair market value at the date of her death.

The court finds the Estate has met its burden of showing that the IRS's assessment of additional estate taxes on contingent bequests amounting to $1,346,000.00 is incorrect. The court finds that the Baer Estate is entitled to a refund of the tax deficiency assessed on the contingent bequests plus interest as allowed under the law. Accordingly,

IT IS ORDERED that judgment will be entered in favor of the plaintiff and against the United States in the amount of $863,587.00, plus interest as allowed by law.

DATED this 23rd day of March, 2010.

BY THE COURT:

s/ Joseph F. Bataillon
Chief District Court Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.